IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

BRIAN E. WILLIAMS,               )
                                 )
          Plaintiff,             )
                                 )
     v.                          )        1:13CV236
                                 )
CAROLYN W. COLVIN,               )
Acting Commissioner of Social    )
Security,                        )
                                 )
          Defendant.             )

**MEMORANDUM OPINION AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Brian E. Williams, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (See Docket Entry 2.) The Court has before it the certified administrative record (cited herein as "Tr. __"), as well as the parties' cross-motions for judgment (Docket Entries 11, 14). For the reasons that follow, the Court should enter judgment for Defendant.

**PROCEDURAL HISTORY**

Plaintiff applied for DIB and SSI, alleging a disability onset date of September 30, 2003. (Tr. 246-55.) Upon denial of those applications initially (Tr. 118-19, 152-57) and on reconsideration (Tr. 120-21, 162-69, 170-79), Plaintiff requested a hearing de novo

before an Administrative Law Judge ("ALJ") (Tr. 180-81). Plaintiff, his mother, his attorney, and a vocational expert ("VE") attended the hearing. (Tr. 42-91.) The ALJ subsequently determined that Plaintiff did not qualify as disabled under the Act. (Tr. 10-28.) The Appeals Council thereafter denied Plaintiff's request for review, thus making the ALJ's determination the Commissioner's final decision for purposes of judicial review. (Tr. 1-5.)

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1. [Plaintiff] meets the insured status requirements of the . . . Act through March 30, 2011.
>
> . . .
>
> 2. [Plaintiff] has not engaged in substantial gainful activity since September 30, 2003, the alleged onset date.
>
> . . .
>
> 3. [Plaintiff] has the following severe impairments: seizure disorder, schizoaffective disorder, bipolar disorder, depression, personality disorder, anxiety disorder, and substance addiction disorder.
>
> . . .
>
> 4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.
>
> . . .
>
> 5. . . . [Plaintiff] has the residual functional capacity to perform a full range of work at all

exertional levels but with the following nonexertional limitations. [Plaintiff] can never climb ladders, ropes, or scaffolds and must avoid even moderate exposure to workplace hazards, such as unprotected heights and dangerous machinery. [Plaintiff] requires work involving only simple, routine, repetitive tasks in that he can apply common sense understanding to carry out oral, written, and diagrammatic instructions. [Plaintiff] is limited to only occasional contact with co-workers and the public. He also requires a stable work environment, one with very few changes.

. . .

6. [Plaintiff] is unable to perform his past relevant work.

. . .

10. Considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform.

. . .

11. [Plaintiff] has not been under a disability, as defined in the . . . Act, from September 30, 2003, through the date of this decision.

(Tr. 15-27 (internal parenthetical citations omitted).)[1]

## DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v.

---

[1] Because the date last insured reflects the last day of the last calendar quarter in which a claimant meets the requirements for entitlement to a period of disability and disability insurance, see 20 C.F.R. §§ 404.102 (defining "[q]uarter or calendar quarter" as "a period of three calendar months ending March 31, June 30, September 30, or December 31 of any year"), 404.130 (explaining rules for determining disability insured status), the ALJ's reference to Plaintiff's date last insured as March 3**0**, 2011, rather than March 3**1**, 2011, constitutes a typographical error (see Tr. 15).

Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of . . . review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). In this case, Plaintiff has not shown entitlement to relief under the extremely limited review standard.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

4

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Social Security Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Social Security Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id.

5

(quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is

---

[2] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. [SSI] . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

6

engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience)

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

7

to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

### B. Assignment of Error

In Plaintiff's sole assignment of error, he contends that the ALJ erred in analyzing Plaintiff's mental impairments in three respects: (1) the ALJ improperly evaluated the opinions of Plaintiff's treating therapist, Katina Dial-Scott (Docket Entry 12 at 4-9); (2) the ALJ "did not adequately address [Plaintiff's Global Assessment of Functioning ('GAF')] scores" (id. at 10); and (3) the ALJ failed to sufficiently consider "the effects of [Plaintiff's] hallucinations on his ability to work" (id.). Plaintiff's contentions do not warrant relief.

**1. Treating Therapist's Opinion**

Plaintiff first argues that the ALJ should have assigned more weight to the opinions of treating therapist, Ms. Dial-Scott, who completed a "Medical Statement Concerning Schizophrenia for Social

---

[5] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

Security Disability Claim" ("Medical Statement") on June 15, 2012. (Id. at 4-5 (citing Tr. 548-50).) According to Plaintiff, the VE "testified that the functional limitations described by [Ms. Dial-Scott] would render [Plaintiff] disabled from working." (Id. at 4 (citing Tr. 88-89).) Plaintiff further asserts that "[t]he reasons the ALJ cited for rejecting [Ms. Dial-Scott's] opinion are not persuasive." (Id. at 5.) Plaintiff faults the ALJ for relying upon an emergency room record from April 2012 which reflected that Plaintiff remained alert and oriented, as "[n]either of th[o]se conditions indicate[d] how [Plaintiff's] schizophrenia and bipolar [disorder] are affecting him." (Id. (citing Tr. 24).) Plaintiff also challenges the ALJ's observation that Ms. Dial-Scott's opinions did "not refer to specific treatment notes to support the conclusions provided" (Tr. 24), because "the regulations do not require [Ms. Dial-Scott's] opinions to include citations to her own medical records – her opinion need only be supported by the medical record" (Docket Entry 12 at 5 (citing Social Security Ruling 06-03p, Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies, 2006 WL 2329939 (Aug. 9, 2006) ("SSR 06-03p") and 20 C.F.R. § 404.1527)).

As an initial matter, the ALJ correctly recognized the possibility that Ms. Dial-Scott did not constitute an "acceptable

9

medical source" under the regulations. (See Tr. 24 (noting "that it is not clear that Ms. [Dial-]Scott is an acceptable medical source").) The regulations categorize therapists such as Ms. Dial-Scott as "[o]ther sources," 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1), rather than "acceptable medical sources," 20 C.F.R. §§ 404.1513(a), 416.913(a) (defined to include, inter alia, "[l]icensed physicians" and "[l]icensed or certified psychologists"). SSR 06-03p addresses the significance of the distinction between "acceptable medical sources" and "other sources" as follows:

> The distinction between "acceptable medical sources" and other health care providers who are not "acceptable medical sources" is necessary for three reasons. First, we need evidence from "acceptable medical sources" to establish the existence of a medically determinable impairment. See 20 [C.F.R. §§] 404.1513(a) and 416.913(a). Second, only "acceptable medical sources" can give us medical opinions. See 20 [C.F.R. §§] 404.1527(a)(2) and 416.927(a)(2). Third, only "acceptable medical sources" can be considered treating sources, as defined in 20 [C.F.R. §§] 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight. See 20 [C.F.R. §§] 404.1527(d) and 416.927(d).

SSR 06-03p, 2006 WL 2329939, at *2 (emphasis added). In light of the reduced deference owed to the opinions of "other sources," the ALJ did not err by failing to give Ms. Dial-Scott's opinions controlling weight.[6]

---

[6] Notably, the record neither reflects nor does Plaintiff argue (see Docket Entry 12 at 4-9) that Ms. Dial-Scott worked so closely under a psychiatrist's or psychologist's supervision that she offered her opinions while acting as the agent of an acceptable medical source. See generally Taylor v. Commissioner of

10

Moreover, the ALJ's analysis of Ms. Dial-Scott's opinions comports with the regulations and SSR 06-03p. After discussing the contents of Ms. Dial-Scott's opinion, the ALJ concluded as follows:

> The undersigned notes that it is not clear that Ms. [Dial-]Scott is an acceptable medical source, but that in light of her status as a treating source <u>this opinion is given some weight</u>.
>
> This opinion, consisting primarily of checked responses, does not refer to specific treatment notes to support the conclusions provided. Nor is [Plaintiff's] past history of alcohol and drug use, as well as medical noncompliance, assessed here. The undersigned notes that two months prior to this opinion, when [Plaintiff] was seen for his reported seizure, he was seen as alert and oriented, <u>appropriately responsive, and with no evidence of thought disturbances</u>. Accepting that [Plaintiff] does have limitations in terms of dealing with detailed instructions and public contact, the limitations of the RFC particularly concerning only occasional interpersonal contact and for simple tasks, would appear to address her concerns.

(Tr. 24-25 (internal citation to the record omitted) (emphasis added).) The above-quoted language makes clear that, contrary to Plaintiff's argument, the ALJ did not "reject[]" Ms. Dial-Scott's opinion (see Docket Entry 12 at 5), but rather gave the opinion "some weight" (Tr. 24), and accommodated Ms. Dial-Scott's opinions regarding Plaintiff's limited ability to deal with detailed

---

Soc. Sec. Admin., 659 F.3d 1228, 1234 (9th Cir. 2011) (holding that nurse practitioner could qualify as "acceptable medical source" where she worked under physician's close supervision such that she acted as physician's agent); Padrta v. Colvin, No. 3:12-CV-01521-KI, 2014 WL 1236185, at *6 (D. Or. Mar. 25, 2014) (unpublished) (holding where "[t]here is no evidence that the nurse practitioner work[ed] closely with and [wa]s supervised by an acceptable medical source[,] . . . the ALJ is only required to give a germane reason to reject [the nurse practitioner's] opinion").

11

instructions and the public (Tr. 25). Further, although Plaintiff faults the ALJ for relying on Plaintiff's status as alert and oriented at his April 2012 hospital visit (see Docket Entry 12 at 5), the ALJ also noted Plaintiff's responsiveness and lack of thought disturbances at that visit (see Tr. 24).

Moreover, although Plaintiff claims that "the regulations do not require [Ms. Dial-Scott's] opinion to include citation to her own medical records" (Docket Entry 12 at 5), SSR 06-03p makes abundantly clear that the ALJ should consider the degree to which a treating source supports and explains his or her opinions in assigning weight to such opinions:

> Although the factors in 20 [C.F.R. §§] 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from "acceptable medical sources," these same factors can be applied to opinion evidence from "other sources." These factors represent basic principles that apply to the consideration of all opinions from medical sources who are not "acceptable medical sources" as well as from "other sources," such as teachers and school counselors, who have seen the individual in their professional capacity. These factors include:
>
> • How long the source has known and how frequently the source has seen the individual;
>
> • How consistent the opinion is with other evidence;
>
> • <u>The degree to which the source presents relevant evidence to support an opinion</u>;
>
> • <u>How well the source explains the opinion</u>;

12

> • Whether the source has a specialty or area
> of expertise related to the individual's
> impairment(s); and
>
> • Any other factors that tend to support or
> refute the opinion.

SSR 06-03p, 2006 WL 2329939, at *4-5 (emphasis added). The ALJ correctly noted that Ms. Dial-Scott's opinions consisted, in large part, of checked boxes without specific reference to treatment notes to support those opinions (see Tr. 24), and did not err by taking that lack of explanation and support into account.

The Court should find no error in the ALJ's consideration of Ms. Dial-Scott's opinions.

**2. GAF Scores**

Next, Plaintiff maintains that the ALJ "did not adequately address [Plaintiff's GAF] scores in his decision." (Docket Entry 12 at 10.) According to Plaintiff, his GAF scores consistently ranged between 40 and 50, which "denotes 'serious symptoms' . . . or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)" and reflected "a sustained inability to work." (Id. at 9-10 (citing American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000) ("DSM-IV-TR")).)[7]

---

[7] The GAF is a numeric scale from 0 to 100 representing a clinician's judgment of an individual's social, occupational and school functioning "on a hypothetical continuum of mental health-illness." DSM-IV-TR at 32.

13

Contrary to Plaintiff's argument, the ALJ did discuss many of Plaintiff's GAF scores in his decision (see Tr. 20, 21, 22, 23, 24) including scores as low as 25 (see Tr. 20) and as high as 55 (see Tr. 20, 22, 23). Moreover, Plaintiff does not explain how the ALJ's further consideration of Plaintiff's GAF scores would have altered the mental RFC in this case. (See Docket Entry 12 at 9-10.) In addition, the ALJ correctly noted the Social Security Administration's stance on GAF scores in effect at the time of his decision:

> The Social Security Administration has not endorsed the GAF scale for use in Social Security and SSI disability claims, as GAF scores do not have a direct correlation to the severity requirements for Social Security mental disorder listings. See 65 Fed. Reg. 50764-65, 2000 WL 1173632 (Aug. 21, 2000). However a GAF score can still be of assistance to an [ALJ] in formulating a claimant's [RFC].

(Tr. 20 n.1.)[8] Further, the ALJ indicated that he had carefully considered the entire record (see Tr. 18), and labored under no

---

[8] After the ALJ issued his decision, the Social Security Administration issued Administrative Message 13066 ("AM-13066"), effective on July 22, 2013, which clarified its position on the relevance of GAF scores: "[W]hen it comes from an acceptable medical source, a GAF rating is a medical opinion . . . . An [ALJ] considers a GAF score with all of the relevant evidence in the case file and weighs a GAF rating as required by 20 [C.F.R.] §§ 404.1527(c) and 416.927(c). . . . [A] GAF needs supporting evidence to be given much weight. By itself, the GAF cannot be used to 'raise' or 'lower' someone's level of function. The GAF is only a snapshot opinion about the level of functioning. It is one opinion that we consider with all the evidence about a person's functioning. Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis."). Notably, the Fifth Edition of the DSM published in 2013 has modified the multiaxial assessment system espoused by the DSM-IV-TR, including discontinuing use of the GAF score. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).

obligation to discuss every piece of evidence in the record, see Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); see also Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

Under these circumstances, the ALJ did not err in his consideration of Plaintiff's GAF scores.

### 3. Hallucinations

Lastly, Plaintiff alleges that the ALJ failed to "adequately address[] the effects of [Plaintiff's] hallucinations on his ability to work." (Docket Entry 12 at 10.) Plaintiff emphasizes that his hallucinations constituted "one of the main reasons he was fired from several jobs," "occurred on a daily basis," and "were not relieved with medication." (Id. (citing Tr. 57).) Plaintiff faults the ALJ for "only consider[ing] [Plaintiff's] depression and social problems when assessing the RFC." (Id.)

A review of the ALJ's decision reflects that the ALJ expressly considered Plaintiff's alleged visual and auditory hallucinations multiple times in his evaluation of Plaintiff's RFC. The ALJ referenced Plaintiff's hearing testimony that he sees "things" (Tr. 19 (referring to Tr. 56)), his denial of auditory hallucinations during his October 2009 inpatient mental health treatment (Tr. 20 (citing Tr. 389)), his endorsement in November 2009 of auditory and visual hallucinations (Tr. 21 (citing Tr. 484)), his reports in June 2010 of delusions and hearing voices (id. (citing Tr. 492)), his claim of auditory and visual hallucinations in July 2010 after

15

running out of his medications, along with his acknowledgment that medication had helped, although not completely stopped, the voices (Tr. 22 (citing Tr. 504)), his report later in July 2010 that he had been doing well since starting his medication and that the voices had decreased considerably (id. (citing Tr. 502)), his denial in August 2010 of active hallucinations (id. (citing Tr. 501)), his statement in May 2011 that he sees "dragons" when very angry with certain others (id. (citing Tr. 535)), his report in August 2011 that the voices never went away in conjunction with his admission that he had run out of Depakote for three days (id. (citing Tr. 534)), his claim in January 2012 of continued voices (id. (citing 533)), his endorsement in July 2012 of auditory hallucinations (id. (citing Tr. 552)), and his statement in March 2011 to a consultative examiner that he sees "shadows" and experiences daily auditory hallucinations (id. (citing Tr. 515)).

After considering this evidence, the ALJ concluded as follows:

> [Plaintiff] alleges that he is unable to work due to hallucinations and problems controlling his anger. The record shows that his mental state is capable of improvement through medication. Progress notes of August 12, 2010, from Community Innovations, show[] that [Plaintiff] was tolerating his medications . . . and that he denied any active hallucinations. However [Plaintiff] has often been non-compliant with both medication and appointments.
>
> . . .
>
> Of course, one of the most significant factors is that despite [Plaintiff's] report of hallucinations, anger control issues, and problems being around people, he is

16

> apparently deemed safe enough to be responsible for his
> two young sons after they come home from school.
> Similarly, [Plaintiff] has been able to maintain a
> relationship with a girlfriend, and to engage in social
> activities such as going to a relative's house to watch
> sports. These factors do not suggest a level of
> impairment sufficient to preclude all employment.

(Tr. 23-24 (internal record citations omitted).) The ALJ also evaluated the opinion evidence relating to Plaintiff's mental impairments, including testimony and a Third Party Function Report from Plaintiff's mother (see Tr. 24-26), before concluding that Plaintiff remained capable, despite his claimed hallucinations, of performing "simple, routine, repetitive tasks in a stable work environment and with only occasional contact with co-workers and the public" (Tr. 26).

The ALJ's decision thus demonstrates that he adequately considered Plaintiff's alleged hallucinations and their impact on his ability to work, and substantial evidence supports the ALJ's findings in that regard.

In sum, Plaintiff's assignment of error lacks merit.

## CONCLUSION

Plaintiff has not established an error warranting remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 11) be denied, that

17

Defendant's Motion for Judgment on the Pleadings (Docket Entry 14) be granted, and that this action be dismissed with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

November 6, 2015

18

Case 1:13-cv-00236-TDS-LPA   Document 17   Filed 11/06/15   Page 18 of 18